**TAYLOR, COLICCHIO & SILVERMAN, LLP**
502 Carnegie Center, Suite 103
Princeton, New Jersey 08540
(609) 987-0022
Attorneys for Plaintiff, American List Counsel, Inc.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## TRENTON VICINAGE

| | |
|---|---|
| AMERICAN LIST COUNSEL, INC. <br><br>　　　　　　　　　　Plaintiff, <br><br> vs. <br><br> ANDREW OSTROY, and BELARDI-OSTROY, LTD. <br><br>　　　　　　　　　Defendants. | FIRST AMENDED COMPLAINT <br><br> Civil Action No.: 3:12-CV-03350-FLW-DEA |

Plaintiff AMERICAN LIST COUNSEL, INC. ("ALC"), having a principal place of business at 4300 US Highway 1, CN-5219, Princeton, New Jersey, by way of its First Amended Complaint against the Defendants, ANDREW OSTROY ("Ostroy"), and BELARDI-OSTROY, LTD. ("B-O"), and, hereby alleges and says as follows:

### NATURE OF THE CASE

1.　　This is an action by the Plaintiff, American List Counsel, Inc. (ALC) against Defendant, Andrew Ostroy, individually and in his capacity as Managing Director/Chairman of the Board and Chief Executive Officer of Belardi/Ostroy ALC, LLC ("the Company"), as well as in his capacity as co-owner of Member/shareholder Defendant Belardi-Ostroy, Ltd. ("B-O"), based upon Ostroy's fraud, bad faith, deceitful conduct and self-dealing, in breach of his duties of good faith and loyalty to the Company and to its only other shareholder/Member, ALC, in violation of

New York Business Corporation Law, including but not limited to BCL §§ 715 and 717, and applicable New York case law.

2.      ALC's reasonable expectations as a shareholder of the Company have been repeatedly violated by the unfair, fraudulent, and oppressive conduct of Andrew Ostroy, who has been operating the Company since its inception.

3.      Together, Ostroy and shareholder/Member B-O have breached, and continue to breach, their fiduciary duties and duties of loyalty to ALC.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.

2.      Venue is proper in the District of New Jersey under 28 U.S.C. §1391 because this is the District in which the Plaintiff maintains its principal place of business, and in which a substantial portion of the acts and omissions giving rise to the claims as described more fully below occurred.

3.      In addition, both the Company's Member Agreement (a true copy of which is annexed hereto as Exhibit A) and the Company's Operating Agreement (a true copy of which is annexed hereto as Exhibit B) specifically provide that :

> For any legal action or proceeding with respect to this Agreement, the parties hereto expressly submit themselves to the Federal courts of The United States of America for the District of New Jersey[.]

See Member Agreement, Exhibit A hereto, §12.03 and Operating Agreement, Exhibit B hereto, §9.8.

## THE PARTIES

4.      Plaintiff, American List Counsel, Inc. ("ALC") is a New Jersey corporation with its principal place of business at 4300 US Highway 1, CN-5219, Princeton, New Jersey 08540.

5.      At all relevant times, ALC has been in the business of providing data marketing services to its clients, enabling those clients to grow, increase market share, and improve profitability through innovative gathering, enhancement, integration, and use of data.

6.      Individual Defendant Andrew Ostroy ("Ostroy") is a citizen of the State of New York, residing at 6 Varick Street, New York, New York 10013.

7.      Ostroy is the Managing Director/Chairman of the Board and Chief Executive Officer of the Company.

8.      Defendant Belardi-Ostroy, Ltd. ("B-O") is a New York corporation with its principal place of business at 16 West 22nd Street, New York, New York 10010.

9.      B-O is owned equally by Ostroy and his business partner, Donna Belardi, a citizen of the state of New York.

## FACTUAL BACKGROUND

### A. Formation of the Company

10.     The Plaintiff, ALC, has been in business since 1978; it is the most respected privately held data marketing services providers in the data management industry.

11.     Before approaching ALC in 1997, Defendant Ostroy and his now business partner, Donna Belardi, were sales persons in the direct mail list industry, employed by a company called "The SpeciaLists, Ltd.," a competitor of ALC.

12.     By 1997, ALC was already a very successful company and an established leader in the data marketing industry.

3

13.     Ostroy wanted to carve out his own space within the industry, without assuming any of the financial risk that accompanies starting a business.

14.     In addition, neither Ostroy nor Belardi maintained the management skills, knowledge, or contacts within the industry or access to the financing necessary to start up a successful data management company.

15.     Moreover, Ostroy and Belardi knew that their then employer, The SpeciaLists, Ltd., would likely assert claims against them for alleged violations of restrictive covenants and unfair competition.

16.     Ostroy approached ALC with a rough 3-year profit and loss projection for a new business venture that Ostroy wanted to begin with ALC, whereby ALC would provide the funding and take the financial risk of the start-up company.

17.     Ostroy's business concept envisioned that Ostroy himself would run the daily operations of the company, which he pitched to ALC as an "exciting, new, largely self-capitalized list management, brokerage and compilation entity to serve, primarily, the catalog market, as well as direct-marketers in general."

18.     Ostroy ultimately negotiated a 50/50 deal with ALC which would enable him to have ownership in a new company within the direct mail data marketing industry, with guaranteed compensation and no financial risk to him, using the financial backing and administrative support of ALC.

19.     In addition, ALC agreed to, and ultimately did, defend Ostroy against the claims brought against him by his former employer, The SpeciaLists, Ltd.

20.     In exchange for ALC's full financial backing, Ostroy agreed to devote all of his work efforts towards the Company, and agreed that the Company would utilize ALC for all support

services, including back-end support for list research, accounting/invoicing, credit & collections, personnel administration, computer systems, purchasing, information technology, interactive media and general data processing services, and would have the Company's offices linked to ALC's corporate computer network for order processing and related data/information.

21.     The Company was founded, and Ostroy and Belardi resigned from The SpeciaLists, Ltd. in December 1997.

22.     ALC reasonably expected that Ostroy and B-O would abide by the terms of the resulting written Member Agreement and Operating Agreement executed by the Members and Ostroy individually for as long as the Company continued to do business.

23.     Ostroy, however, has consistently and intentionally violated the letter and the spirit of both the Member Agreement and the Operating Agreement, in violation of his fiduciary duties to ALC, including his duties of good faith and loyalty.

24.     With respect to the shareholders/Members of the Company, instead of Ostroy and Belardi each taking a 25% share in the new LLC being formed with ALC, Ostroy convinced Belardi to form the Defendant limited partnership, B-O, with him, so that B-O could be the owner of 50% of the new LLC.

25.     Ostroy knew that, as a result of this maneuver, he would be able to control both the Company's 50% owner/Member, B-O and, in turn, the Company, which he planned to operate on a day-to-day basis.

26.     Although ALC did not realize it at the time, Ostroy's subsequent actions have made it clear that the foregoing maneuver was just the beginning of the steps that Ostroy intended to, and did, take to further his own self-interest at the expense of ALC, in violation of his fiduciary duties as well as in violation of the Company's Operating Agreement.

27.     ALC reasonably expected that its significant financial investment and its 50% ownership interest in the Company would be protected by specifically providing in the Member Agreement that corporate governance of the Company was required to coincide and be consistent with that of ALC as a whole, that all significant functions of the Company would have to be accomplished in accordance with ALC standard practices, be subject to ALC's review and approval, and that ALC would provide this start-up Company with all necessary support services

28.     So as not to stress the cash flow of the new Company, ALC agreed to provide the Company with support services in exchange for compensation based upon the Company's revenue, as opposed to a fixed fee. (See Member Agreement, annexed hereto as Exhibit A, Articles II and III.)

29.     On December 19, 1997, the Company was formed under the name "ALC of New York, LLC" by its two (2) Members: the Plaintiff, ALC, and the Defendant, B-O. (See Exhibit A.)

30.     The Company's Member Agreement provides for a Board of Directors consisting of five (5) members: two (2) nominated by ALC; two (2) nominated by B-O; and one (1) agreed upon by both ALC and B-O. (Exhibit A, Article I, § 1.01.)

31.     In December 2011, however, Ostroy successfully persuaded the fifth member of the Board of Directors to resign as Director, in furtherance of his plan to oust ALC from the Company, as will be more fully described in the following paragraphs.

32.     The Member Agreement specifically provides, among other things, that a significant portion of the consideration for ALC's agreement to fund and support the formation of the Company, to defend and indemnify Ostroy and Belardi from and against any action or proceeding against them by their former employer,  and to pay them 50% of the value of any commissions that they lost as a result of leaving their former employer and joining ALC, was

the Members' corresponding agreements to certain voting arrangements, to limitations on the transfer or disposition of the equity interests of Ostroy, Belardi and B-O, and to have ALC provide the Company with critical support services. (Exhibit A, WHEREAS ¶¶ and Articles X and XI.)

33.    The Member Agreement also specifically provides, among other things:

(a) That "the general corporate governance of the Company shall coincide and be consistent with that of ALC as a whole" (Exhibit A, Article II, Lines 1-3);

(b) That "All significant functions of the Company including, but not limited to, business plan development, client negotiations, annual budgets and financial reporting will be accomplished in accordance with ALC's standard practice and be subject to the review and approval of the Board of Directors" (Exhibit A, Article II, Lines 3-6).

34.    Ostroy has, intentionally and in bad faith, failed and refused to comply with the terms set forth in Article II of the Member Agreement, by, among other things, failing and refusing to submit the requisite items to the Board of Directors for review and approval, in breach of his fiduciary duties to ALC and in violation of applicable New York law.

35.    In addition, the Member Agreement specifically provides:

(a) That, as long as B-O has a membership interest in the Company, B-O "shall not conduct any business activities (including incurring any debt) other than to hold its membership interests in the Company" (Exhibit A, Article IV, § 4.15);

(b) That the parties would each "vote their respective equity interests in B&O (as the case may be) and their respective interests in the Company, and otherwise use their best efforts to cause the Company and/or B&O, as the case may be, to perform the tasks to be performed by a particular party under this Agreement and any ancillary agreements entered into in connection herewith." (Exhibit A, Article XII, §12.01);

(c) That, "The rights of the parties under this Agreement are unique and, accordingly, the parties shall, in addition to such other remedies as may be available to any of them at law or equity, have the right to enforce their rights hereunder by actions for specific performance to the extent permitted by law." (Exhibit A, Article XII, §12.05);

36.    Ostroy has, intentionally and in bad faith, failed and refused to comply with the terms set forth in Articles IV and XII of the Member Agreement, by, including but not limited to, his

7

refusal to use his best efforts to cause the Company to perform the tasks it is bound to perform under the Member Agreement, in breach of his fiduciary duties to ALC and in violation of applicable New York law.

37.    On that same day, December 19, 1997, ALC and B-O entered into an Operating Agreement for the Company (annexed hereto as Exhibit B).

38.    That Operating Agreement provides, in pertinent part, that:

(a) "The initial capital contribution of ALC shall consist of the start up capital of the Company and the initial capital contribution of B&O shall consist of (i) client contacts of B&O's shareholders and (ii) the personal good will of B&O's shareholders." (Exhibit B, Section II, ¶ 3.1);

(b) Twice a month the Company would make cash advances to B-O in amounts due to Ostroy and Belardi under their respective Employment Agreements, which amounts B-O would then pay over to Ostroy and Belardi and which amounts would be deducted from the annual distribution to be paid over to B-O if the Company was successful and had profits to distribute at the end of the year (Exhibit B, Section IV);

(c) If the Company was not successful enough to cover the amounts due Ostroy and Belardi under their respective Employment Agreements, the Company would loan sufficient funds to B-O to pay Ostroy and Belardi the compensation due them under their respective Employment Agreements (Exhibit B, Section IV);

(d) The Board of Directors shall use its best faith efforts to cause the Company to distribute to its Members amounts sufficient to enable the Members to pay their income tax liabilities but, to the extent that such distributions cannot be made by the Company, ALC would loan the Company the money needed to make such distributions (Exhibit B, Section IV, ¶ 4.2);

(e) "[A]ll management powers over the business and affairs of the Company shall be exclusively vested in the Board of Directors.... No Member, by virtue of having the status of a Member, shall have any management power over the business and affairs of the Company or actual or apparent authority to enter into contracts on behalf of, or to otherwise bind the Company." (Exhibit B, Section V, ¶ 5.1(a));

(f) The business affairs of the Company shall be managed under the direction of the Board of Directors and routine business functions, "including, but not limited to, financial reporting, business plan development, annual budgets and client negotiations and service pricing shall be accomplished in accordance with the ALC standard practices as amended from time to time." (Exhibit B, Section V, ¶ 5.1(a));

(g) The authority of the Directors and Officers "shall be identical to the authority and functions of the board of directors and officers, respectively, of a corporation organized under the New York Business Corporation law." (Exhibit B, Section V, ¶ 5.1(a)).

8

39.    Ostroy has, intentionally and in bad faith, failed and refused to comply with the terms set forth in Sections IV and V of the Operating Agreement, by, among other things, intentionally failing and refusing to report to and/or obtain the consent and approval of the Board of Directors before entering into and/or terminating contracts on behalf of the Company, and by failing and refusing to manage the Company under the direction of the Board of Directors, in breach of his fiduciary duties to ALC and in violation of applicable New York law.

40.    The Operating Agreement further provides, in pertinent part:

    (a) The affirmative vote of a majority of the Directors present at or participating in a meeting "shall be required to authorize any action of the Board of Directors." (Exhibit B, Section V, ¶ 5.2(c));

    (b) The Board of Directors is restricted from taking any action in contravention of the Operating Agreement without the approval of the Members, including any action that would make it impossible to carry on the ordinary business of the Company, or that would amend or modify the Operating Agreement in any manner (Exhibit B, Section V, ¶ 5.4);

    (c) Except as otherwise specifically provided by the Operating Agreement or by a resolution of the Board of Directors, "no Director or group of Directors shall have any actual or apparent authority to enter into contracts on behalf of, or to otherwise bind, the Company, nor take any action in the name of or on behalf of the Company or conduct any business of the Company other than by action of the Board of Directors taken in accordance with the provisions of this Agreement…." (Exhibit B, Section V, ¶ 5.4);

    (d) The Board may designate Managing Directors who shall have general charge and supervision over the Company's business and affairs, and may enter into contracts not in the regular course of business of the Company if those contracts are authorized by the Board. (Exhibit B, Section V, ¶ 5.5(d));

    (e) All funds of the Company shall be deposited in bank accounts opened in the Company's name, at institutions and in types of accounts as determined by the Board of Directors, which will also determine the persons who will have authority with respect to the accounts and the funds therein. (Exhibit B, Section VIII, ¶ 8.1).

41.    Ostroy has, intentionally and in bad faith, failed and refused to comply with the terms set forth in Sections V and VIII of the Operating Agreement, by, among other things: intentionally failing and refusing to report to and/or obtain the consent and approval of the Board of Directors

before entering into and/or terminating contracts on behalf of the Company; taking actions in the name of or on behalf of the Company without required Board of Directors approval; conducting business in his own self-interest at the expense of the Company and Member/shareholder ALC; conducting himself in a deceitful manner in violation of the Operating Agreement; opening up a bank account for the Company without the knowledge or approval of the Board of Directors, and upon which Ostroy is the only authorized signatory; and, failing and refusing to otherwise manage the Company under the direction of the Board of Directors, in breach of his fiduciary duties to ALC and in violation of applicable New York law.

42.      The Operating Agreement also provides, in pertinent part, that "the duties and obligations owed to the Company and its Members by the Officers and the members of the Board of Directors and any such duties that may be owed by any Member shall be the same as the respective duties and obligations owned (sic) to a corporation organized under the New York Business Corporation Law by its officers and directors[.]"(Exhibit B, Section V, ¶ 5.8.)

43.      New York Business Corporation Law provides, among other things, that an officer of a corporation shall perform his duties in good faith and that a director shall perform his duties as director in good faith. NYBCL §§ 715 and 717.

44.      By his deceitful conduct in violation of the Operating Agreement, and by the actions he has taken in furtherance of his own self-interests as opposed to the best interests of the Company and its Member/shareholder, ALC, and by his failure and refusal to manage the Company with the review and approval of the Board of Directors and/or in accordance with ALC standard practices as required by the Operating Agreement (Exhibit B, Section V, ¶ 5.1(a)), Ostroy has breached his obligations under the Operating Agreement and the Member Agreement, as well as

his fiduciary duties, including his duties of good faith and of loyalty, as provided for by New York law.

45.     On December 19, 1997, Ostroy also entered into an Employment Agreement with the Company, a true copy of which is annexed hereto as Exhibit C.

46.     Ostroy's Employment Agreement guaranteed Ostroy an annual draw from the start-up Company, and provided Ostroy the right to take advance draws from the Company based upon his projected gross commission for his first year of employment, and the right to take advances against anticipated distributions to B-O during that year, as well as the right to participate in any pension, profit sharing, bonus, life insurance, hospitalization, major medical and other employee benefit plans consistent with those provided to similarly situated employees of ALC. (Exhibit C, Article III, §§ 3.1-3.4 and 3.7).

47.     Ostroy's Employment Agreement further provided that the Company would furnish Ostroy with Executive office space, equipment, supplies and other facilities and personnel as the Company deemed appropriate, and would deem all reasonable expenses incurred by Ostroy in the performance of his Executive duties as expenses of the Company. (Exhibit C, Article IV).

B.  **ALC Keeps Up Its End of the Deal**

48.     By December 31, 1998, the Company owed ALC more than $750,000, of which approximately $200,000 consisted of advances to B-O.

49.     According to the Company's Balance Sheet as of December 31, 1998, total stockholders' and members' equity was negative (-$320,201).

50.     An analysis of the Company's Income (Loss) as of April 30, 1999 reflected a cumulative loss of $270,825 to the Company since its inception, attributable to the compensation paid to Ostroy and Belardi as draws and payroll tax expenses.

51.     Draws paid to Ostroy, Belardi, and B-O, as of April 30, 1999 reflected Total Advance Distributions in the amount of $713,862.

52.     An analysis of draws versus distributions to Ostroy and Belardi, as of April 30, 1999, including the "Anticipatory Distribution" components of their compensation packages, reflected a total profit contribution shortfall of more than $1,000,000.

53.     The May 5, 1999 Board of Directors Meeting Agenda therefore included a discussion of approving the budget for fiscal year July 1999-June 2000 "including setting of discretionary spending limits."

54.     The May 5, 1999 Agenda also included consideration of a name change for the Company, proposed by Ostroy.

55.     The Company lost an additional $68,000 in May 1999 and, by the beginning of July of that year, and projected year-end loss of $250,000, while draws taken by Ostroy and Belardi continued to grow (the projected loss did not include the expenses that would be incurred as a result of changing the name of the Company).

56.     By October 31, 1999, ALC had advanced nearly $1.3 million in working capital to the Company and more than $1 million in shareholders advances. In total, ALC had in excess of 2.3 million dollars of cash at risk at the close of 1999.

57.     At the March 28, 2000 Board meeting, ALC representatives stated that, while ALC never intended to fund the Company at this level, it would not back out of its obligations under the Member Agreement and Operating Agreement, and would continue to provide financial and service support the Company.

58.     By October of 2000, Ostroy demanded that a salary component be added to his compensation package, complaining that, because his compensation was tied to the Company's profits, he was making less money than he had at his former place of employment.

59.     Ostroy also complained that his title as the Company's "Managing Director" confused clients, and he requested that his title be changed to "Chairman of the Board," stating that the title change would not include any additional management authority because "it is more of a figurehead position."

60.     Ostroy also requested that he and Belardi be named Officers of the Company, again suggesting that it would help them sell the Company's services to clients; he requested that he be given the title of CEO, and that Belardi the title of President.

61.     Once Ostroy acknowledged to the Board of Directors that these new titles would not confer any additional management authority to him, the Board agreed to adopt the titles.

62.     The working capital advance from ALC to the Company for the twelve (12) months ended August 31, 2001 was more than $1.5 million.

63.     As of August 31, 2001, the Company owed ALC nearly $2 million.

64.     As of August 31, 2001, B-O owed the Company nearly $2 million, nearly $1.2 million of which consisted of advances to Ostroy and Belardi.

65.     Throughout this time period, the Board continued to advise that the Company should cut costs.

66.     In an effort to continue to support the struggling Company, beginning in fiscal year 2002, ALC agreed to reduce the percentage of revenue it was entitled to be paid for the support services it was providing to the Company, from 15% to 13.5%.

67.     At the same time, Ostroy refused to cut his own compensation, and, over the years, continued to insist on being paid more in order to continue to run the Company's daily operations.

68.     ALC continued to support Ostroy to the greatest extent possible, allowing him to increase overall compensation despite the Company's financial struggles in its first decade, as well as to charge to the Company increasing expenses he claimed were "necessary" to grow the business, at the expense of ALC's share of profits and at the expense of ALC's entitlement to full compensation for the support services it continued to provide to the Company.

69.     As of January 2005, ALC owned a 50% membership interest in the Company, but had provided 100% of the financing to fund the Company.

70.     As of January 2005, the Company (employing ALC's capital) had advanced amounts to Ostroy, Belardi and B-O in excess of B-O's percentage share of the Company's cumulative earnings.

71.     Rather than honor ALC's support and patience, Ostroy continued to usurp management of the Company and operate it as if he was its sole owner in every respect except those involving risk or liability.

### C. Ostroy's Mismanagement, Self-Dealing, and Breach of Fiduciary Duties to ALC

72.     On November 29, 2005, a Certificate of Amendment of the Articles of Organization of the Company was filed, changing its name from "ALC of New York, LLC" to "Belardi/Ostroy ALC, LLC."

73.     Since the name of the Company was changed, Ostroy has intentionally and systematically blurred and erased the distinction between the Company and B-O in his dealings with clients, potential clients, and the public in general, as well as with respect to charging expenses and

14

incurring liabilities on behalf of himself and/or B-O and having them paid for by the Company, in clear violation of both the letter and the spirit of the Member Agreement and the Operating Agreement.

74.     For example, at the suggestion of Ostroy, in December 2005 the Company changed its name to "Belardi/Ostroy ALC, LLC"; its website, at www.belardiostroyalc.com, refers to the Company merely as "Belardi Ostroy," thereby providing Ostroy himself with publicity and a mechanism for transitioning away from his business partner, ALC, at the expense of the Company.

75.     In addition, Ostroy has executed commercial lease agreements outside of New York on behalf of "Belardi/Ostroy" without Board approval, including leases at various locations in California, but submitted the rental charges to the Company for payment, again obtaining the benefit of his own personal exposure at the expense of the Company.

76.     When questioned by ALC and the Board, Ostroy simply maintained that, as the Company CEO, he has the right and authority to conduct business as he saw fit, and he did not need Board or Member approval to do so, in direct contravention of his prior statements to the Board, referenced in Paragraph 66 hereof.

77.     Between 2002 and 2010, when ALC agreed to further reduce the percentage of revenue it was entitled to receive in exchange for its funding of the Company and its obligation to provide support services to the Company, Ostroy continually increased his own compensation and expense payments, as well as those of others who were "on his team," despite the substantial amounts of monies owed to ALC for its advances to Ostroy and B-O.

78.     For the FYE 2003, compensation accounted for 44% of the Company's revenue, totaling $3,597,617 (of $5,122,243).

79.     Five (5) years later, for the FYE 2008, compensation accounted for 56% of the Company's revenue, and totaled $4,421,932 (of $7,892,989).

80.     For the FYE 2009, while ALC had again voluntarily reduced the agreed-upon percentage of revenue it was to receive in exchange for the services it was providing to the Company, to 12.2%, compensation to Ostroy and his staff accounted for 60.7% of the Company's revenue.

81.     No member or employee of ALC has ever received compensation from the Company.

82.     For the FYE 2011, ALC again voluntarily reduced the agreed-upon percentage of revenue it was to receive in exchange for the services it was providing to the Company to 11.2%.

83.     In spite of ALC's financial concessions, Ostroy continued to usurp operational authority and breach his fiduciary duties to the Company and ALC.

84.     In 2011, without Board approval, Ostroy opened up new bank accounts for the Company with a different bank than the bank with which the Company and ALC has regularly done business.

85.     Despite demands that he do so, Ostroy has refused to add ALC or any other signatories, other than himself, to the account; the only signatory on the account is Ostroy.

86.     At the December 14, 2011 Board of Directors meeting, Ostroy was asked to produce to the Board a copy of the Board Resolution that was signed and sent to the bank to establish the new accounts.

87.     No such Resolution has ever been produced to the Board or ALC.

88.     At the December 14, 2011 Board of Directors meeting, Ostroy stated that he does not intend to have any other signatories on the new accounts, as he does not believe that anyone from ALC needs to be involved in the Company banking in any way.

89.     Ostroy continues to submit invoices for his personal expenses to the Company for payment by the Company, including bills from his personal attorneys, despite the fact that ALC has vehemently objected to paying Ostroy's personal legal expenses.

90.     Ostroy also continues to charge personal expenses to the company credit card, including but not limited to travel expenses and expensive tickets to sporting events and the theater for himself and his family.

91.     Ostroy has also employed his children and their friends at the Company, without Board approval, and without even informing the Board or ALC of their qualifications or of what positions they hold or duties and responsibilities they purportedly meet.

92.     In 2011, Ostroy went so far as to secretly solicit ALC's controller, a long term and key employee, to leave his employment with ALC and join "Andy's team" in New York.

93.     In 2011, Ostroy transferred check signing privileges for the Company from ALC to himself, without Board approval.

94.     Immediately, the Company began to receive complaints from clients, forcing it to reissue and replace checks for various clients because of lost and missing checks, illegible and missing signatures, and improper mailings, which caused problems and issues for clients, including one of the Company's biggest accounts.

95.     Ostroy also, without Board approval and over the objections of ALC and its appointed Board members, transferred administration of the Company's Employee Benefits Expenses and Payroll Deductions from ALC to ADP, a third party service provider.

96.     At the December 14, 2011 Board meeting, the Company CFO and counsel also voiced objections to Ostroy's proceeding with the ADP contract without Board approval and over the objections of ALC and its appointed Board members.

97.     Ostroy's personal attorney attended the December 14, 2011 Board meeting, and argued that Ostroy, as CEO, had the authority to proceed with the ADP contract without Board approval.

98.     Over the objections of ALC and the Company's counsel, Ostroy transferred the account to ADP, which has resulted in increased expenses to the Company.

99.     The switch to ADP has resulted in increased expenses to the Company of approximately $46,445 as of April 30, 2012.

### D.  Ostroy's Plan to Oust ALC from the Company

100.    At the December 14, 2011 Board meeting, Ostroy announced that, as CEO of the Company, he had decided to "terminate the support services agreement" between the Company and ALC.

101.    The Company's counsel explained to Ostroy that support services were provided to the company by ALC as part of the Member Agreement, and therefore could not be unilaterally terminated by Ostroy.

102.    Ostroy and his personal attorney took the position that the support services "agreement" was simply a vendor contract between ALC and the Company, and could be terminated by the CEO.

103.    Ostroy's personal attorney further suggested that, because ALC was an "interested party," its appointed Board members did not have the right to vote on anything relating to the support services.

104.    Ostroy reiterated that, because he was the Company CEO, he was therefore entitled to make this decision and terminate the ALC support services.

105.    It was apparent to ALC and its appointed Board members that Ostroy was engaging in a ploy, and was in actuality seeking to bully ALC into selling its equity interest in the Company to Ostroy at substantially less than the fair value of that interest.

106.    This suspicion was confirmed when, after the Board meeting, Ostroy presented a buy-out proposal to ALC which was significantly below an amount ALC had previously offered to Ostroy to purchase his ownership interest in the Company.

107.    Since that time, Ostroy has continued to coerce ALC into selling its interest in the Company to him at significantly below the legitimate value of that interest.

108.    Ostroy has now formally notified ALC that he will no longer abide by the support services provision of the Member Agreement, which was a significant part of the consideration that ALC received in exchange for its agreement to fully fund and support the Company whether the Company was profitable or not.

109.    By letter dated April 17, 2012, written on letterhead entitled "Belardi Ostroy", Ostroy informed ALC that "senior executives of the Company, having consulted with counsel, had determined it was in the best interests of the Company and its members to terminate the Support Services." A true copy of that letter is annexed hereto as Exhibit D.

110.    By the foregoing letter, Ostroy notified ALC that the Company hereby 'terminates all Support Services effective as of the close of business on May 31, 2012, subject to the transitional matters described below." (Exhibit D.)

111.    In that same letter, Ostroy then proceeds to unilaterally dictate the manner in which the transition will be made from ALC to other vendors for various support services.

112.   By letter dated April 30, 2012, ALC responded to Ostroy's April 7, 2012 correspondence, unequivocally stating that the Company "simply does not have the right" to unilaterally modify the Member Agreement. A true copy of that April 30, 2012 letter is annexed hereto as Exhibit E.

113.   By its April 30, 2012 letter, ALC reminded Ostroy that the support services provision of the Member Agreement "was part and parcel of our decision to form ALC of New York in the first place." (Exhibit E.)

114.   ALC further explained:

> Without that agreement, we would never have made the decision to invest in you and [Belardi] and provide both the seed money and on-going financial support necessary to get the company going, as well as to enable it to survive he start-up challenges all new businesses face.
>
> Neither you nor [Belardi] invested a single penny in the company. Nor did you assume any of the financial risk associated with a start-up. Yet, you were granted a 50% equity stake in the company, the value of which can now be measured in millions of dollars...."

(Exhibit E, page 1, ¶ 2-3.)

115.   ALC further noted concern about the fact that while the Company's revenue had increased over the last fiscal year, the Company's increased expenses had created another shortfall in profit over the same period last year. (Exhibit E, page 2, ¶ 2.)

116.   In fact, under Ostroy's continued mismanagement of the Company, and failure and refusal to comply with the terms of the Member Agreement, comply with the terms of the Operating Agreement, act in good faith as an officer and director of the Company, and comply with his fiduciary duties under New York law, the Company continues to increase expenses at a rate that exceeds its incremental revenues, despite Ostroy's own projections of weak economic growth and lower revenue for the Company in the foreseeable future.

117.    By his April 30, 2012 letter (Exhibit E hereto), the ALC Chairman, in his capacity as a Board member of the Company, called for a Board meeting as soon as possible.

118.    In response, and consistent with his scheme, Ostroy has threatened to file a derivative action against ALC seeking a Declaratory Judgment decreeing that he and the Company have a right to invalidate the support services provision of the Member Agreement and to terminate the Member Agreement itself, in violation of both the Member Agreement and the Operating Agreement, his duty to act in good faith, and his fiduciary duties under both New York and New Jersey law.

## COUNT ONE (Breach of the Member and Operating Agreements)

119.    ALC repeats and realleges each and every allegation set forth in the prior Paragraphs hereof as if set forth at length herein.

120.    As fully set forth in the foregoing paragraphs of this Complaint, Ostroy has consistently and intentionally violated the letter and the spirit of both the Member Agreement and the Operating Agreement.

121.    Among other things, the Member Agreement specifically provides that the Company be governed consistently with the governance of ALC as a whole, and that "All significant functions of the Company including, but not limited to, business plan development, client negotiations, annual budgets and financial reporting will be accomplished in accordance with ALC's standard practice and be subject to the review and approval of the Board of Directors" (Exhibit A, Article II, Lines 3-6).

122.    Ostroy has, intentionally and in bad faith, failed and refused to comply with the terms set forth in Article II of the Member Agreement, by, among other things, failing and refusing to

submit the requisite items to the Board of Directors for review and approval, in breach of his fiduciary duties to ALC and in violation of applicable New York law.

123.   In addition, the Member Agreement specifically provides, among other things, that Ostroy and B-O would use their best efforts to perform the tasks required of them under the agreement.

124.   As fully set forth in the preceding paragraphs of this Complaint, both Ostroy and B-O have intentionally failed and refused to comply with their obligations under the Member Agreement.

125.   The Operating Agreement for the Company (annexed hereto as Exhibit B) in pertinent part provides that the Company's business affairs shall be managed under the direction of the Board of Directors and in accordance with the standard practice of ALC.

126.   The Operating Agreement further provides, in pertinent part:

   (a) The affirmative vote of a majority of the Directors present at or participating in a meeting "shall be required to authorize any action of the Board of Directors." (Exhibit B, Section V, ¶ 5.2(c));

   (b) The Board of Directors is restricted from taking any action in contravention of the Operating Agreement without the approval of the Members[;] (Exhibit B, Section V, ¶ 5.4);

   (c) No Director "shall have any actual or apparent authority to enter into contracts on behalf of, or to otherwise bind, the Company, nor take any action in the name of or on behalf of the Company or conduct any business of the Company other than by action of the Board of Directors taken in accordance with the provisions of this Agreement…." (Exhibit B, Section V, ¶ 5.4); and,

   (d) All funds of the Company shall be deposited in bank accounts opened in the Company's name, at institutions and in types of accounts as determined by the Board of Directors, which will also determine the persons who will have authority with respect to the accounts and the funds therein. (Exhibit B, Section VIII, ¶ 8.1).

127.     As fully set forth in the preceding paragraphs of this Complaint, Ostroy has, intentionally and in bad faith, failed and refused to comply with the terms set forth in Sections V and VIII of the Operating Agreement, by, among other things: intentionally failing and refusing to report to and/or obtain the consent and approval of the Board of Directors before entering into and/or terminating contracts on behalf of the Company; taking actions in the name of or on behalf of the Company without required Board of Directors approval; conducting business in his own self-interest at the expense of the Company and Member/shareholder ALC; conducting himself in a deceitful manner in violation of the Operating Agreement; opening up a bank account for the Company without the knowledge or approval of the Board of Directors, and upon which Ostroy is the only authorized signatory; and failing and refusing to otherwise manage the Company in good faith and under the direction of the Board of Directors.

128.     By virtue of the foregoing Andrew Ostroy and Belardi-Ostroy, Ltd. have breached both the letter and the spirit of the Member Agreement and the Operating Agreement to which they are bound, in violation of those Agreements and of applicable New York law.

WHEREFORE, the Plaintiff, American List Counsel, Inc., hereby demands judgment against the Defendant, Andrew Ostroy, individually and in his capacity as Managing Director/Chairman of the Board and Chief Executive Officer of the Company, as well as against Defendant, Belardi-Ostroy, Ltd.:

A.  Specifically enforcing and permanently compelling the performance of all of their obligations under the Operating Agreement, as provided for by Section IX, ¶ 9.3 thereof;

B.  Specifically enforcing and permanently compelling the performance of all of their obligations under the Member Agreement, as provided for by 12.05 thereof;

C.  Permanently restraining and enjoining the Defendants from entering into or terminating any contracts on behalf of the Company without the express approval of the Company Board of Directors;

23

    D.   Permanently restraining and enjoining the Defendants from further dissipation of corporate funds;

    E.   Awarding ALC compensatory damages;

    F.   Awarding ALC costs and attorneys' fees; and,

    G.   Awarding ALC such other and further relief as the Court deems just and equitable under the circumstances.

## COUNT TWO (Breach of Fiduciary Duties and Violations of New York Law)

129.    ALC repeats and realleges each and every allegation set forth in the prior Paragraphs hereof as if set forth at length herein.

130.    As Chief Executive Officer/Managing Director of Belardi/Ostroy ALC, LLC, Andrew Ostroy has continually and intentionally violated his fiduciary duties to ALC, a 50% owner/Member of the Company, Belardi/Ostroy ALC, LLC.

131.    The Operating Agreement provides, in pertinent part, that "The authority of the Directors and Officers "shall be identical to the authority and functions of the board of directors and officers, respectively, of a corporation organized under the New York Business Corporation law." (Exhibit B, Section V, ¶ 5.1(a)).

132.    The Operating Agreement also provides, in pertinent part, that "the duties and obligations owed to the Company and its Members by the Officers and the members of the Board of Directors and any such duties that may be owed by any Member shall be the same as the respective duties and obligations owned (sic) to a corporation organized under the New York Business Corporation Law by its officers and directors[.]"(Exhibit B, Section V, ¶ 5.8.)

133.    New York Business Corporation Law provides, among other things, that an officer of a corporation shall perform his duties in good faith and that a director shall perform his duties as director in good faith. NYBCL §§ 715 and 717.

134.    New York common law further requires managing and operating Members to keep the other owners of the LLC informed of any and all opportunities that the controlling managing Member pursues in the name of the Company.

135.    New York common law deems the following conduct, among other conduct, to constitute fraud and/or bad faith in violation of an officer or director's fiduciary duties and/or duties of good faith and loyalty: deceitful conduct in violation of the LLC's Operating Agreement; entering into agreements benefitting the officer, director, and/or his or her own company without fully disclosing material facts about such agreements to the LLC Members; using Company assets for one's own benefit and/or to divert business away from the LLC and/or undermine client confidence.

136.    By his deceitful conduct in violation of the Operating Agreement, and by the actions he has taken in furtherance of his own self-interests as opposed to the best interests of the Company and its Member/shareholder, ALC, Ostroy has breached his fiduciary duties, including his duties of good faith and of loyalty, as provided for by New York law.

137.    By his failure and refusal to manage the Company with the review and approval of the Board of Directors and/or in accordance with ALC standard practices as required by the Operating Agreement (Exhibit B, Section V, ¶ 5.1(a)), Ostroy has breached his fiduciary duties, including his duties of good faith and of loyalty, as provided for by New York law.

138.    By his failure and refusal to report to and/or obtain the consent and approval of the Board of Directors before entering into and/or terminating contracts on behalf of the Company, and by failing and refusing to manage the Company under the direction of the Board of Directors, Ostroy has, intentionally and in bad faith, violated the terms of the Operating Agreement and

breached his fiduciary duties, including his duties of good faith and of loyalty, as provided for by New York law.

139.   As a result of the foregoing, ALC has sustained substantial damages.

WHEREFORE, the Plaintiff, American List Counsel, Inc., hereby demands judgment against the Defendant, Andrew Ostroy, individually and in his capacity as Managing Member/Chairman of the Board and Chief Executive Officer of the Company, Belardi/Ostroy ALC, LLC, as well as against his company, Belardi-Ostroy, Ltd.:

A.   Enjoining the Defendants from continued dissipation of corporate funds;

B.   Declaring that Andrew Ostroy has breached his fiduciary duties to ALC;

C.   Compelling Andrew Ostroy and Belardi-Ostroy, Ltd. (and its owners, including Donna Belardi) to reimburse the Company for all compensation paid and expenses taken which were not approved by the Board of Directors;

D.   Awarding ALC compensatory damages;

E.   Awarding ALC punitive damages;

F.   Awarding ALC prejudgment interest;

G.   Awarding ALC costs and attorneys' fees; and,

H.   Awarding ALC such other and further relief as the Court deems just and equitable under the circumstances.

Respectfully submitted,

TAYLOR, COLICCHIO & SILVERMAN, LLP
502 Carnegie Center, Suite 103
Princeton, New Jersey 08540
(609) 987-0022
Attorneys for the Plaintiff, American List Counsel, Inc.

By: /s/ *Philip M. Colicchio, Esq.*

Dated:  June 12, 2012